UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

v.

DR. BOBBY V. KHAN,

                Defendant.

Civ. No. _____

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The plaintiff Securities and Exchange Commission ("Commission") files this Complaint and alleges as follows:

1. This matter involves insider trading by Defendant Dr. Bobby V. Khan ("Defendant"). Defendant purchased common stock of Georgia-based pharmaceutical company Sciele Pharma, Inc. ("Sciele" or the "Company") (formerly NASDAQ: SCRX), following Defendant's receipt of material nonpublic information about Sciele's acquisition by a Japanese pharmaceutical company from a long-time business associate and friend, who was then a senior officer of Sciele ("Sciele Officer").

2.  In May 2008, the Sciele Officer advised Defendant of a possible acquisition of Sciele by Japanese pharmaceutical company Shionogi & Co., Ltd. ("Shionogi"). Defendant promised the Sciele Officer that he would keep the information confidential. However, following the receipt of additional information concerning Sciele's acquisition in telephone and dinner conversations between Defendant and the Sciele Officer, in August 2008, Defendant opened a brokerage account (his first since 2003), transferred approximately one-third of his then-liquid net worth into that account, and purchased a combined total of 4,000 shares of Sciele stock, just days before the public announcement of Shionogi's tender offer for Sciele stock on Labor Day, September 1, 2008.

3.  Following the tender offer announcement, Defendant sold all of his Sciele shares in October 2008, realizing profits of over $45,000 and a return of over 60% in less than two months.

4.  Defendant has engaged in, and unless restrained and enjoined by this Court, will continue to engage in acts and practices which constitute and will constitute violations of Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. 240.10b-5 and 240.14e-3].

5. The Commission brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendant from engaging in transactions, acts, practices and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object, for disgorgement of illegally obtained funds and pre-judgment interest thereon, for civil monetary penalties and other equitable relief.

## JURISDICTION AND VENUE

6. This Court has jurisdiction of this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

7. Defendant, directly and indirectly, has made use of the mails and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

8. Venue lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Defendant resides within this District, and certain of the actions set forth herein occurred within the Northern District of Georgia.

## DEFENDANT AND RELATED PERSONS OR ENTITIES

9. <u>Defendant Dr. Bobby V. Khan</u> is a cardiologist who resides in the Northern District of Georgia and is licensed to practice medicine in the State of Georgia. Defendant is also a founder and served on the Board of Directors of InVasc Therapeutics, Inc. ("InVasc").

10. <u>Sciele Officer</u> was a senior officer of Sciele between 2006 through Shionogi's acquisition of Sciele in 2008. From 2006 through 2009, the Sciele Officer also served as a member of the Advisory Board of InVasc. In 2009, the Sciele Officer became a member of the Board of Directors of InVasc.

11. <u>Sciele</u> was a Delaware corporation headquartered in Atlanta, Georgia that specialized in the sale, marketing and development of products related to cardiovascular, diabetes, women's health, and pediatric medical conditions. The stock of Sciele was traded on the NASDAQ market under the symbol SCRX and its securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act.

12. <u>Shionogi</u> is a Japanese pharmaceutical company that acquired Sciele through a cash tender offer of $31.00 per share for Sciele common stock, which tender offer was publicly announced on Labor Day, September 1, 2008.

## **DEFENDANT AND THE SCIELE OFFICER**

13. Following graduation from medical school and residency, Defendant practiced as a cardiologist in Georgia for several years.

14. Beginning in or about 2003, Defendant and the Sciele Officer met through a mutual professional association.

15. Over the next several years, their relationship developed into a personal relationship, which included dinners, regular socializing and the sharing of confidential information.

16. In 2006, Defendant founded InVasc, a pharmaceutical development company. At or around the time of its founding in 2006, Defendant asked the Sciele Officer to serve as a member of the Advisory Board of InVasc, an offer which the Sciele Officer accepted and role which he continued through May 2009. During his time as a member of the Advisory Board, Defendant and the Sciele Officer had various discussions concerning matters relating to InVasc.

17. As a result of their personal and business relationship, Defendant and the Sciele Officer had a history and practice of sharing confidential information with one another, with the expectation that each would maintain the confidentiality of the information received and not misuse it.

18.  Between 2006 through Shionogi's acquisition of Sciele in 2008, the Sciele Officer also served as a senior officer of Sciele.

## SHIONOGI'S ACQUISITION OF SCIELE

19.  On April 28, 2008, the Shionogi Management Committee convened to discuss company candidates for possible acquisition by Shionogi. The Committee ultimately selected Sciele as the preferred target candidate, selected a U.S. based financial advisor for the transaction "(Financial Advisor") and formulated a tentative schedule for the acquisition.

20.  On April 29, 2008, a Managing Director of the Financial Advisor contacted a member of Sciele's Board of Directors, with whom he had had prior business relations, to express Shionogi's strong interest in acquiring Sciele.

21.  On April 30, 2008, this Sciele Board Member conveyed and discussed Shionogi's interest in Sciele with Sciele's CEO.

22.  On May 8, 2008, Sciele's regular investment banker ("Investment Banker") spoke with Sciele executives about Shionogi's possible acquisition of Sciele.

23. In early May 2008, arrangements were made for senior executives of Shionogi to travel from Japan to Atlanta to meet with Sciele management to discuss the acquisition.

24. In early May 2008, Sciele, with the assistance of its Investment Banker, instructed its legal advisor to draft a confidentiality agreement concerning the acquisition.

25. On May 13, 2008, Shionogi's Financial Advisor forwarded sent to Sciele's senior executives certain information that it had prepared about Shionogi (including its financial condition and drug pipeline), bio information about Shionogi's senior executives, and a proposed meeting agenda for the upcoming meetings between Shionogi and Sciele executives. Some or all of this information was shared with the Sciele Officer.

26. As of at least May 14, 2008, the Sciele Officer became aware of Shionogi's interest in acquiring Sciele when he was advised that he would be participating in meetings in Atlanta, Georgia on June 4 and 5, 2008 between Sciele's senior executives and Shionogi senior officers and directors traveling from Japan.

27. On May 19, 2008, Sciele's CEO formally informed Sciele's Board of Directors of Shionogi's interest in acquiring Sciele.

28. Between May 29, 2008 and August 18, 2008, Shionogi engaged in substantial due diligence of Sciele. As a senior officer, the Sciele Officer's role and responsibilities in this due diligence process included answering questions about certain areas of Sciele's business.

29. Between August 11 and 15, 2008, the Sciele Officer also participated in a series of interviews conducted by Shionogi's due diligence team concerning various aspects of Sciele's business. During this time period, the parties, through their attorneys, also began drafting and reviewing drafts of the acquisition agreement between Shionogi and Sciele, a process that continued through late August.

30. On August 18, 2008, the Sciele Officer was advised, in a senior management meeting, that Shionogi had concluded its due diligence, wanted to negotiate a definitive acquisition agreement, and hoped to announce an acquisition offer no later than September 1, 2008.

31. On August 28, 2008, Shionogi transmitted to Sciele's Board its tender offer to acquire all of Sciele's outstanding common stock for $31.00 per share.

32. On August 29, 2008, Sciele's Board voted unanimously to accept Shionogi's tender offer and recommend the transaction to Sciele's shareholders.

33. On August 29, 2008, the last day of trading prior to the Labor Day weekend, Sciele's share price closed at $19.27.

34. On Labor Day, September 1, 2008, the companies announced the execution of their agreement for Shionogi's acquisition of all common stock of Sciele via a Shionogi tender offer of $31.00 per share.

35. Following the tender offer announcement, Sciele's shares traded at a much higher price, ultimately closing on September 2, 2008 at $30.67 per share, a premium of $11.40, or approximately 59%, over its prior closing share price on August 29, 2008.

## DEFENDANT OBTAINS AND TRADES ON NONPUBLIC MATERIAL INFORMATION OF THE TENDER OFFER

36. On Friday, May 16, 2008 – two days after the Sciele Officer had learned (by at least May 14) that senior Shionogi executives would be traveling from Japan concerning Shionogi's acquisition of Sciele – Defendant had dinner with the Sciele Officer at an Atlanta restaurant.

37. At the May 16 dinner, the Sciele Officer advised Defendant of Shionogi's strong interest in acquiring Sciele.

38. Two days after that dinner, on Sunday, May 18, 2008, Defendant emailed the Sciele Officer stating, at the end of this email: *"Had a great dinner with you on Friday and I wish all the best with the*

*negotiations on the potential buyout of Sciele. Of course, I will keep it confidential."*

39. In August 2008, Defendant and the Sciele Officer had a number of additional meetings and discussions, including: (a) a thirteen minute telephone conversation between them on August 16, 2008, the day after Shionogi's completion of the due diligence interviews of Sciele's managers, including an interview of the Sciele Officer; (b) a dinner on August 20, 2008, and (c) another dinner on August 27, 2008.

40. At some or all of such discussions, the Sciele Officer provided updates to Defendant on the Shionogi acquisition and tender offer.

41. Defendant knew that this information provided by the Sciele Officer was non-public or recklessly failed to know such information was non-public.

42. Defendant agreed and had a duty to keep this information confidential.

43. Based on Defendant's promises and past history with the Sciele Officer of sharing and maintaining in confidence confidential information, Defendant knew or was reckless in not knowing that the information provided by the Sciele Officer was expected to be maintained as confidential by Defendant and not be misused.

44. On Monday, August 18, 2008 – the same day that the Sciele Officer was advised that Shionogi wished to conclude outstanding due diligence and move to finalize the acquisition agreement with Sciele – Defendant opened a brokerage account at Vanguard for securities trading, the first such account he had owned since 2003.

45. Between August 19 and August 28, 2008, Defendant transferred $84,000 into his Vanguard account – an amount equal to one-third of his then-liquid net worth – and purchased a combined total of 4,000 Sciele shares for an aggregate investment of $76,749.

46. From 2003 to August 2008, Defendant's only purchases of publicly traded securities were his purchases of Sciele stock.

47. At the close of trading on Friday, August 29, 2008, Sciele's share price was $19.27.

48. Following the Labor Day, September 1, 2008 announcement of Shionogi's tender offer for Sciele at a price of $31.00 per share, Sciele's stock moved sharply upward, closing at $30.67 per share on September 2, 2008, an increase of $11.40, or approximately 59%, over Sciele's August 29, 2008 closing share price.

49. On October 14, 2008, Defendant sold all of his Sciele shares, realizing profits of over $45,000 and a return of over 60% in less than two months.

50. In 2009, Defendant resigned as Chief Executive Officer of InVasc, but continued to serve on the Board of Directors for InVasc.

51. In 2009, the Sciele Officer became a member of InVasc's Board of Directors.

## CLAIMS FOR RELIEF

### COUNT I—FRAUD
### Violations of Section 10(b) of the Exchange Act [15. U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5]

52. Paragraphs 1 through 51 are hereby realleged and are incorporated herein by reference.

53. In connection with the purchase and sale of securities described herein, Defendant, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a) employed devices, schemes, and artifices to defraud;

    b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c)  engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

54. The Defendant knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, the Defendant acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

55. By reason of the foregoing, the Defendant, directly and indirectly, has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II-FRAUD IN CONNECTION WITH A TENDER OFFER
### Violations of Section 14(e) of the Exchange Act [15. U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. 240.14e-3]

56. Paragraphs 1 through 55 are hereby realleged and are incorporated herein by reference.

57. In connection with the purchase and sale of securities described herein, Defendant, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly: made untrue

13

statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or engaged in fraudulent, deceptive, or manipulative acts or practices, in connection with a tender offer or request or invitation for tenders, or a solicitation of security holders in opposition to or in favor of any such offer, request, or invitation, all as more particularly described above.

58. By reason of the foregoing, Defendant violated, and unless enjoined will continue to violate and cause violations of, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. 240.14e-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission, respectfully prays that the Court:

I.

Make findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

II.

Issue a permanent injunction enjoining Defendant and his agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of the order by personal service or otherwise, and each of them:

    a.    from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5]; and

    b.    from violating Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. 240.14e-3].

### III.

Issue an Order requiring Defendant to disgorge all ill-gotten gains as alleged in the Commission's Complaint, plus pay prejudgment interest thereon.

### IV.

Issue an Order requiring Defendant, pursuant to Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1], to pay civil monetary penalties.

V.

Issue an Order that retains jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may have been entered or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

VI.

Grant such other and further relief as may be necessary and appropriate.

RESPECTFULLY SUBMITTED,

/s/ Paul T. Kim
Paul T. Kim
Senior Trial Counsel
Georgia Bar. No. 418841
M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868

COUNSEL FOR PLAINTIFF
U. S. SECURITIES AND EXCHANGE COMMISSION
3475 Lenox Road, N.E., Suite 500
Atlanta, Georgia 30326-1234
Tel:    (404) 842-7600
Email:  kimpau@sec.gov
        loomism@sec.gov